1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11

VICTOR ARGENIS REA-HERNANDEZ,

Petitioner,

v.

PAMELA BONDI, Attorney General of the
United States, et al.,

Respondents.

CASE NO. 2:25-cv-02609-TL

ORDER ON PETITION FOR WRIT
OF HABEAS CORPUS

12
13
14
15
16
17

        This matter is before the Court on Petitioner Victor Argenis Rea-Hernandez's Petition for

18   Writ of Habeas Corpus. Dkt. No. 1. Petitioner, who is presently detained at the Northwest ICE

19   Processing Center ("NWIPC") (*id.* at 2), seeks: (1) his release from custody; (2) an order that

20   prevents his re-detention without a hearing before a neutral decision maker; (3) an order that

21   prevents his removal to a third country without notice and a meaningful opportunity to respond;

22   and (4) an order that prevents his removal to a third country on the basis that such removal

23   represents unconstitutional punishment. *See id.* at 26–27. Having reviewed the Petition,

24

Respondents' Return (Dkt. No. 6), and Petitioner's Reply (Dkt. No. 11), the Court GRANTS the Petition.

## I.    BACKGROUND

Petitioner was born on November 5, 1991, in Venezuela; he is a Venezuelan citizen. Dkt. No. 1 at 5, 6. On July 2, 2022, Petitioner entered the United States "at or near Eagle Pass, Texas." Dkt. No. 7 (Correa Decl.) ¶ 4. Petitioner was detained inside the United States and, on July 3, 2022, was "paroled by Border Patrol" under 8 U.S.C. § 1182(d)(5) and "enrolled in Alternatives to Detention."[1] *Id.* ¶ 5. Petitioner was "given a Call-In Letter directing him to report to an ERO [Enforcement and Removal Operations] office in Dallas, Texas on August 2, 2022." *Id.* It is unclear whether Petitioner reported to the ERO office in Dallas on that date; neither Party directly discusses that particular fact. Petitioner asserts that he was "out of custody in the United States from 2022 until 2025." Dkt. No. 1 at 7. During this time period, Petitioner "was working as an assistant to an automobile mechanic" in Utah, and he asserts that he "was not aware of any reporting requirement." *Id.*; *see id.* at 3.

Respondents assert that "[o]n January 8, 2025, Petitioner failed to report to ERO in Utah as directed." Dkt. No. 6 at 12.[2] However, Respondents do not provide any evidence that Petitioner had been so directed. On January 10, 2025, a Notice to Appear ("NTA") was sent to Petitioner at his last known address, advising him that he was charged as inadmissible and therefore subject to removal from the United States.[3] Dkt. No. 8-2 (NTA) at 2. The NTA directed Petitioner to appear at Immigration Court in Salt Lake City, Utah, on June 13, 2028. *Id.*

---

[1] This provision permits the government to temporarily release a noncitizen from custody within the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

[2] It is unclear whether Petitioner's January 1, 2025, state-court charge had anything to do with his requirement to report to ERO on January 8.

[3] The NTA provided by Respondents appears to be missing at least one and possibly multiple pages. Additionally, the record does not indicate if this NTA was ever filed with the Immigration Court, or if Petitioner was issued a new

On January 27, 2025, Petitioner was "encountered via vehicle stop," upon which "ERO Officers conducted a field investigation and determined that [Petitioner] was in violation of immigration law." Dkt. No. 8-1 at 3. A Department of Homeland Security ("DHS") arrest warrant was issued the same day, indicating probable cause that Petitioner was removable from the United States based on "the pendency of ongoing removal proceedings" and evidence that he "lack[ed] immigration status." Dkt. No. 8-3 (Warrant for Arrest of Alien) at 2). During the field investigation, officers obtained state-court records for four alleged traffic violations and one pending misdemeanor charge; these details were recorded on DHS Form I-213.[4] *See* Dkt. No. 8-1 at 3–4. However, nothing in the I-213, the arrest warrant, or elsewhere in the record suggests that these incidents were a factor in his January 27 arrest. Additionally, none of the documents provided by Respondents, other than the declaration of a Deportation Officer, acknowledges that Petitioner had been previously released on humanitarian parole, indicates any conditions of release, or indicates any violation of those conditions.

Petitioner has been in Respondents' custody since his arrest. Dkt. No. 1 at 6. On February 4, 2025, Petitioner was transferred to NWIPC. Dkt. No. 6 at 13. On March 31, 2025, Petitioner applied for Asylum and Withholding of Removal. *Id.* On May 12, 2025, an Immigration Judge denied Petitioner's asylum application, and Petitioner was ordered removed. Dkt. No. 1 at 7; Dkt. No. 1-1 (Immigration Court Order) at 2. Because Petitioner waived his right to appeal the removal order, it became administratively final. *See* Dkt. No. 1-1 at 3. However, the Immigration

---

NTA after he was later arrested. The Court notes, however, that the ground of inadmissibility charge on the provided NTA does not align with the Immigration Court's finding of removability on Petitioner's ultimate order of removal. *Compare* Dkt. No. 7-2, *with* Dkt. No. 1-1 at 2.

[4] Specifically, according to the I-213, on January 1, 2025, Petitioner was charged in Utah state court with the misdemeanor of Driving Under the Influence and four traffic violations: No Drivers License in Possession, Failure to Obey Lane Use Control Signal, License Plate Location Violation, and High Occupancy Vehicle Lane Restriction. *See* Dkt. No. 8-1 at 3–4.

Judge granted Petitioner's application for withholding of removal[5] to Venezuela under the

Convention Against Torture based on evidence that "he was shot by CICPC,[6] a Venezuelan

police force, and his mother filed a complaint against them." Dkt. No. 1 at 7; Dkt. No. 1-1 at 2.

Because Petitioner has been granted Withholding of Removal, he cannot be removed to

Venezuela. Respondents have been attempting to remove Petitioner to a third country—i.e., a

state other than Venezuela—but have been unable to do so. ICE has advised Petitioner that it

intends to remove Petitioner to Mexico, and Petitioner asserts that "ICE has asked other

countries to accept [Petitioner] but has failed." Dkt. No. 1 at 7; *see* Dkt. No. 1-2 (Notice of

Removal) at 2. Petitioner is unwilling to accept removal to Mexico because he "was kidnapped

twice the last time he traveled through" that country. *Id.* On January 12, 2026, Respondents filed

a notice of intent to remove Petitioner to Mexico. Dkt. No. 15.[7] To substantiate assertions made

in the notice, Respondents provided a declaration from Mihaela Hammer, a Deportation Officer

assigned to NWIPC, dated January 13, 2026. Dkt. No. 24. But although Hammer's declaration is

dated January 13, 2026, Respondents did not file it on the docket until January 23, 2026. In the

declaration, Hammer averred that United States Citizenship and Immigration Services

("USCIS") interviewed Petitioner "regarding his fear of being removed to Mexico" and issued a

"Negative Fear Finding regarding Mexico." *Id.* ¶¶ 7, 10. Hammer asserted further that

"Petitioner is expected to be removed to Mexico later this week," and that "Mexico is ready to

accept Petitioner." *Id.* ¶¶ 12–13. On January 13, 2026, Petitioner filed an emergency motion

seeking a court order preventing Petitioner's transfer out of the Western District of Washington

---

[5] Petitioner asserts that he was "initially ordered removed on an unknown date." Dkt. No. 1 at 3. The record does not indicate whether his removal order was incident to his first encounter with ICE, in 2022, or his more recent encounter, in 2025.

[6] *Cuerpo de Investigaciones Científicas, Penales y Criminalísticas.*

[7] On January 13, 2026, Respondents filed an amended notice. Dkt. No. 17.

1  during the pendency of his habeas petition. Dkt. No. 16. That same day, the Court provisionally

2  granted Petitioner's motion and prohibited Petitioner's transfer without further order of the

3  Court. Dkt. No. 18.

## II.    LEGAL STANDARD

5       "Writs of habeas corpus may be granted by . . . the district courts . . . within their

6  respective jurisdictions." 28 U.S.C. § 2241(a). To succeed on a petition for a writ of habeas

7  corpus, a petitioner must show he "is in custody in violation of the Constitution or laws or

8  treaties of the United States." *Id.* § 2241.

9       Under the Due Process Clause of the Fifth Amendment to the United States Constitution,

10  no person shall be "deprived of life, liberty, or property, without due process of law . . . ." U.S.

11  Const. amend. V. The Fifth Amendment guarantee of due process applies in removal

12  proceedings. *Torres-Aguilar v. I.N.S.*, 246 F.3d 1267, 1270 (9th Cir. 2001). In addition, the

13  Supreme Court has held that "the Due Process Clause protects [a noncitizen] subject to a final

14  order of deportation . . . ." *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001) (citing *Wong Wing v.*

15  *United States*, 163 U.S. 228, 238 (1896)); *see also Demore v. Kim*, 538 U.S. 510, 523 (2003)

16  (recognizing that Fifth Amendment due process protections extend to removal proceedings, but

17  noting that "detention during deportation proceedings [is] a constitutionally valid aspect of the

18  deportation process.").

## III.    DISCUSSION

20       Petitioner seeks a writ of habeas corpus on five grounds: (1) Petitioner's continued

21  detention in immigration custody violates the due process clause of the Fifth Amendment (*see*

22  Dkt. No. 1 at 22); (2) Respondents' re-detention of Petitioner in 2025 violated Petitioner's

23  procedural due process rights (*see id.* at 23); (3) Respondents' re-detention of Petitioner failed to

24  comply with regulatory obligations (*see id.*); and (4) Respondents' third-country removal policy

violates the Fifth Amendment, the Immigration and Nationality Act ("INA"), the Convention

Against Torture, the Administrative Procedure Act ("APA"), and regulatory requirements (*see*

*id.* at 24); and (5) Respondents' third-country removal policy violates the Fifth and Eighth

Amendments (*see id.* at 24–25). The Court will address these in turn.

**A.      Ground One: Petitioner's Continued Detention**

**1.      Legal Framework for Detention under the INA**

Petitioner is detained under 8 U.S.C. § 1231. Under Section 1231(a)(1), "when [a

noncitizen] is ordered removed, the Attorney General shall remove the [noncitizen] from the

United States within a period of 90 days (in this section referred to as the 'removal period')."

8 U.S.C. § 1231(a)(1). Section 1231(a)(2) mandates the detention of the noncitizen during the

removal period. *Id.* § 1231(a)(2). Finally, Section 1236(a)(6) authorizes the continued detention

of noncitizens after the expiration of the removal period:

> [A noncitizen] ordered removed who is inadmissible under section
> 1182, removable under section 1227(a)(1)(C), 1227(a)(2), or
> 1227(a)(4) of this title or who has been determined by [the
> Secretary of Homeland Security][8] to be a risk to the community or
> unlikely to comply with the order of removal, may be detained
> beyond the removal period and, if released, shall be subject to the
> terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6).

Although there is no temporal limit on the length of detention in the statute, the Supreme

Court observed in *Zadvydas* that "Congress enacted the present law, which liberalizes pre-

existing law by shortening the removal period from six months to 90 days, mandat[ing] detention

---

[8] Although 8 U.S.C. § 1231 refers to "the Attorney General" as having responsibility for detention and removal of noncitizens, the Homeland Security Act of 2002, Pub. L. No. 107-296 § 441(2), 116 Stat. 2135, 2192 (2002), transferred this authority to the Secretary of the Department of Homeland Security. *See also* 6 U.S.C. § 251.

of certain criminal [noncitizens] during the removal proceedings and for the subsequent 90-day

removal period . . . ." The Supreme Court reasoned:

> While an argument can be made for confining any presumption to
> 90 days, we doubt that when Congress shortened the removal
> period to 90 days in 1996 it believed that all reasonably
> foreseeable removals could be accomplished in that time. We do
> have reason to believe, however, that Congress previously doubted
> the constitutionality of detention for more than six months."

*Zadvydas*, 533 U.S. at 701 (citing Juris. Statement in *United States v. Witkovich,* O.T. 1956,

No. 295, at 8–9.)

The *Zadvydas* Court held that the INA does not authorize "indefinite, perhaps permanent,

detention" of noncitizens subject to final orders of removal under Section 1231(a)(6), *id.* at 699,

instead construing the statute to contain an "implicit 'reasonable time' limitation," *id.* at 682.

"[F]or the sake of uniform administration in the federal courts," the Supreme Court recognized

six months as that time limitation. *Id.* at 701. It found that if a statute were to permit indefinite

detention of a noncitizen, that would "raise a serious constitutional problem" under the Fifth

Amendment's Due Process Clause. *Id.* at 690. "Freedom from imprisonment—from government

custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause

protects." *Id*.

Ultimately, the Supreme Court determined that it is "presumptively reasonable" for DHS

to detain a noncitizen for six months following entry of a final removal order while it works to

remove the individual from the United States. *Id.* at 701. However, "[a]fter this 6-month period,

once the [noncitizen] provides good reason to believe that there is no significant likelihood of

removal in the reasonably foreseeable future, the Government must respond with evidence

sufficient to rebut that showing." *Id.* If the Government fails to rebut the noncitizen's showing,

the noncitizen is entitled to habeas relief. *Id*.

### 2.    Petitioner's Circumstances

#### a.    Presumptively Reasonable Period of Detention

The six-month presumption "does not mean that every [noncitizen] not removed must be released after six months. To the contrary, [a noncitizen] may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. Nevertheless, "for detention to remain reasonable, as the prior period of postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.*

Here, the Parties agree that Petitioner has been subject to a removal order since no later than May 12, 2025. Dkt. No. 6 at 6; Dkt. No. 1 at 22. Petitioner asserts that he "ha[s] been detained in ICE custody for 11 months, including nearly six months since the IJ decision." Dkt. No. 1 at 3.[9] Respondents do not rebut Petitioner's assertion of how long he has been detained, nor do they provide any indication that there has been a pause or suspension in his detention between the filing of the habeas petition on December 18, 2025, and now. Therefore, the Court finds that Petitioner has been detained beyond the presumptively reasonable time period.

#### b.    Significant Likelihood of Removal in the Reasonably Foreseeable Future

Petitioner also satisfies his burden under *Zadvydas* to show that there is no significant likelihood of removal in the foreseeable future. Petitioner asserts that he "has obtained withholding of removal to Venezuela and has no ties to other countries." Dkt. No. 1 at 22. Courts routinely find that noncitizens under such circumstances have met their initial burden under *Zadvydas*. *See, e.g.*, *Shadalo v. Mattos*, No. C25-2076, 2025 WL 3568234, at *6 (D. Nev. Dec.

---

[9] As of the date of this Order, Petitioner has been in ICE custody for more than 13 months, including eight months since he has been subject to the removal order.

14, 2025); *Vishal v. Chestnut*, No. C25-1469, 2025 WL 3511815, at *3 (E.D. Cal. Dec. 8, 2025);

*Gomez v. Mattos*, No. C25-975, 2025 WL 3101994, at *5 (D. Nev. Nov. 6, 2025); *Hmung v.

Bondi*, No. C25-1303, 2025 WL 3657221, at *3 (W.D. Okla. Dec. 9, 2025), *report and

recommendation adopted,* 2025 WL 3670499 (Dec. 17, 2025); *Sukhyani v. Bondi*, Case

No. C25-1243 (W.D. Okla. Nov. 18, 2025), *report and recommendation adopted*, 2025 WL

3283274 (Nov. 25, 2025); *Trejo v. Warden of ERO El Paso East Mont.*, No. C25-401, 2025 WL

2992187, at *5 (W.D. Tex. Oct. 24, 2025); *Misirbekov v. Venegas*, No. C25-168, 2025 WL

2450991, *1 (S.D. Tex. Aug. 15, 2025); *see also Nadarajah v. Gonzales*, 443 F.3d 1069, 1081

(9th Cir. 2006) (recognizing that a grant of withholding of removal under the Convention

Against Torture to a noncitizen "is a powerful indication of the improbability of his foreseeable

removal, by any objective measure").

### c.    Respondents' Rebuttal

The burden now shifts to Respondents to rebut Petitioner's showing that there is no

significant likelihood of removal in the reasonably foreseeable future. Respondents must

"respond with evidence sufficient to rebut that showing." *Nguyen v. Scott*, 796 F. Supp. 3d 703,

723 (W.D. Wash. 2025) (quoting *Zadvydas*, 533 U.S. at 701).

Respondents' first argument is that they "ha[ve] sought request for acceptance forms for

Petitioner in approximately twenty-four countries." Dkt. No. 6 at 13. That is, they have asked 24

different countries for permission to remove Petitioner to within their respective borders.

Evidently, none has given it. Respondents provide no indication that any of these 24 countries

has agreed to accept Petitioner. "The fact that Respondents intend to complete a travel document

request for Petitioner does not make it significantly likely he will be removed in the foreseeable

future." *Hoac v. Becerra*, No. C25-1740, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025); *see

also, e.g.*, *Pham v. Scott*, No. C26-27, 2026 WL 238994, at *5 (W.D. Wash. Jan. 29, 2026);

*Jaranow v. Bondi*, No. C25-2396, 2026 WL 35864, at *4 (W.D. Wash. Jan. 6, 2026). Indeed,

Petitioner asserts that "only five of the 25 [*sic*] countries [Respondents] ha[ve] asked even

responded to their scattershot request, and each of those five (Costa Rica, Denmark, Australia,

Mongolia, and Thailand) responded in the negative." Dkt. No. 11 at 7 (citing Dkt. No. 7 (Correa

Decl.) at 3). In sum, that Respondents have sought permission to remove Petitioner does not

equate to a likelihood that they will remove him, especially where such permission has been

repeatedly either withheld or the request for it has been ignored.

Respondents next look to Mexico as a destination for Petitioner. "On June 26, 2025,

Petitioner was served with a Notice of Intent to remove to Mexico; he refused to sign the

document." Dkt. No. 6 at 13. Petitioner's unwillingness to go to Mexico renders Respondents'

position untenable. Petitioner has provided evidence indicating that the Mexican government

does not accept individuals who do not willingly accept removal to Mexico. *See* Dkt. No. 1-3

(Parsons Decl.) ¶ 11; Dkt. No. 19-1 (Lopez Decl.) ¶¶ 4–5. When presented with similar evidence

regarding nonconsensual removal to Mexico, a court in this District found that "[s]uch evidence

casts doubt on Respondents' ability to remove [petitioner] to Mexico in the reasonably

foreseeable future." *Olea Sanchez v. Bondi*, No. C25-2573, 2026 WL 160882, at *3 (W.D. Wash.

Jan. 21, 2026); *see also Jumel Coke v. Bondi*, No. C26-71, 2026 WL 221514, at *2 (W.D. Wash.

Jan. 28, 2026) (finding that evidence of Mexico's refusal to accept individuals who do not

consent to removal to Mexico pointed away from a significant likelihood of removal). Moreover,

given Mexico's conditioning its acceptance of Petitioner on Petitioner's consent, USCIS's

"negative fear finding regarding Mexico" is immaterial. *See* Dkt. No. 24 ¶¶ 7, 10.

Respondents' final argument—that "[i]f removal to Mexico is not possible,

[Respondents] may seek removal to another third country"—is the weakest of all. It is not even a

statement of intention, and the Court rejects it out of hand.

*     *     *

In sum, pursuant to *Zadvydas*, Petitioner has demonstrated that his continued detention is unlawful. A writ of habeas corpus is thus warranted with respect to Petitioner's ongoing detention.

**B.      Ground Two: Procedural Due Process and Past Re-Detention**

Having already reached a determination sufficient to grant the habeas petition, the Court need not reach the question of whether Petitioner's "re-detention violated his due process rights and was therefore unlawful"—especially given the paucity of argument from Petitioner on this point. *See* Dkt. No. 1 at 23. The Court assumes, however—without the benefit of argument from the Parties on this point—that any finding it reached as to the legality of Petitioner's re-detention and resulting deprivation of liberty *during his removal proceedings* would be irrelevant to the petition before the Court now, which challenges his *current* detention. Even if Petitioner had not been re-detained on January 27, 2025, he would still have been subject to mandatory detention during the removal period that began when his removal order became final on May 12, 2025. His current detention stems from the detention authorized by his removal order, not from the original re-detention.[10]

Relatedly, the Court denies Petitioner's request for an order that Respondents "may not re-detain Petitioner without first holding a hearing before a neutral decisionmaker at which the

---

[10] Further complicating the argument on this claim, Respondents misstate the procedural history, arguing that "a pre-deprivation hearing [was not required] before revoking an OSUP for the purposes of executing a removal order." Dkt. No. 6 at 16. Petitioner was not detained for the purposes of executing a removal order; no removal order existed at the time. Nor has Petitioner ever been released on an Order of Supervision.

Similarly, Petitioner appears mistaken in its assuming that he was released on an Order of Release of Recognizance ("OREC") (*See* Dkt. No. 1 at 11); such a document would not have been issued if and when Petitioner was paroled pursuant to 8 U.S.C. § 1182(d)(5).

All in all, the general confusion about the terms of Petitioner's prior release, the complete lack of documentation, and the lack of any information related to his compliance or noncompliance with said conditions all leave the Court with serious doubts as to whether Petitioner was ever enrolled in Alternatives to Detention (which is not required for individuals paroled under 8 U.S.C. § 1182(d)(5)).

government bears the burden of establishing flight risk or danger to the community by clear and convincing evidence based on changed circumstances since Petitioner was previously released." Dkt. No. 1 at 26. First, the Court has been given no argument weighing the legality of any hypothetical future re-detention, beyond the regulatory requirements of 8 C.F.R. § 241.13(i) (*see* Dkt. No. 1 at 13–15). The limited procedural due process analysis Petitioner has offered considered the interest involved in his *previous* re-detention. Now that he has a removal order, those interests have fundamentally changed. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court."); *Suong v. Bondi*, No. C25-2309, 2025 WL 3718644, at *5 (W.D. Wash. Dec. 23, 2025) (holding that ("pursuant to the party presentation doctrine, the Court will not invent arguments for" petitioner)). Second, if circumstances change and Petitioner's removal becomes reasonably foreseeable, Respondents might legally re-detain him for the purposes of removing him, and would not be required to establishing that he poses a danger or risk of flight. But the injunction Petitioner seeks would prevent even *lawful* detention in furtherance of Petitioner's removal. This would be an extraordinary remedy, and Petitioner has not made the required showing for such relief. *See infra* Section III.C.2 (discussing the burden and elements for injunctive relief).

Accordingly, the Court declines to reach legality of Petitioner's re-detention, and denies Petitioner's request for injunctive relief.[11]

---

[11] Although the Court does not reach the Parties' arguments at to the lawfulness of Petitioner's past re-detention, it acknowledges that it was troubled by Respondents' implication that due process arguments are "irrelevant" because "Petitioner was detained following a criminal arrest for driving under the influence, failed to report for required check-ins on multiple occasions in multiple states, and has pending criminal charges in Utah." Dkt. No. 6 at 21. For one thing, none of these was the basis for his re-detention. Second, the evidence cited (and indeed, the entire record before the Court) supports only one third of this sentence—i.e., that Petitioner has a pending criminal charge in Utah, for misdemeanor DUI.

**C.      Ground Three: Regulatory Requirement of Re-Detention**

While Petitioner offers no constitutional analysis of any future re-detention, he does identify and explain the regulatory provision that will apply, specifically 8 C.F.R. § 241.13(i). *See* Dkt. No. 1 at 13–15. As Respondents note, this section is a "boilerplate" statement of law and does not support (or appear to allege) any claim of regulatory violation related to Petitioner's past re-detention. Dkt. No. 6 at 20.

The Court is aware of the regulatory framework that will govern Petitioner's release, and Petitioner does not establish (or even allege) that Respondents will violate it. To the extent that Petitioner alleges Respondents violated 8 C.F.R. § 241.13 when they re-detained him in the past (*see* Dkt. No. 1 at 23–24), this argument fails because Petitioner was not subject to § 241.13 before he was ordered removed.

The Court therefore DENIES this portion of the petition, which is not clearly connected to any request for relief not already addressed.

**D.      Grounds Four and Five: Third-Country Removal**

In addition to his immediate release, Petitioner requests two orders related to his potential removal to a third country: that "Respondents may not remove or seek to remove Petitioner to a third country without notice and meaningful opportunity to respond in compliance with the [INA] and due process in reopened removal proceedings," and "that Respondents may not remove Petitioner to any third country"—at all—"because Respondents' third-country removal program seeks to impose unconstitutional punishment on its subjects, including imprisonment and other forms of harm." Dkt. No. 1 at 26–27.

**1.      Respondents' *D.V.D.* Argument Fails**

Respondents contend that Petitioner cannot obtain relief because he is a member of the plaintiff class in *D.V.D. v. Department of Homeland Security,* No. C25-10676 (D. Mass.). In

1   *D.V.D.*, the district court certified a class of noncitizen petitioners and enjoined the Government

2   from removing them to third countries unless specific conditions were met. 778 F. Supp. 3d 355,

3   392–93 (D. Mass. 2025). It found that the petitioners were likely to show that "[d]efendants have

4   a policy or practice of executing third-country removals without providing notice and a

5   meaningful opportunity to present fear-based claims." Thus, it found the Government's third-

6   country removal policy or practice likely violates procedural due process. *Id*. at 387. The

7   Government appealed the injunction, and the Supreme Court eventually stayed that injunction in

8   an unexplained, emergency-docket order. *D.V.D.*, 145 S. Ct. 2153 (2025).

9         Here, Respondents argue that, under Ninth Circuit precedent, a class member like

10   Petitioner cannot request the same relief in a separate action. Dkt. No. 6 at 18 (citing *Pride v.*

11   *Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)). This Court, along with others in this District, has

12   already rejected that argument and found that, under these circumstances, Ninth Circuit

13   precedent permits Petitioner to seek individual relief, and Respondents' reliance on *Pride v.*

14   *Correa* is misplaced. *See, e.g.*, *Elshourbagy v. Bondi*, No. C25-2432, 2025 WL 3718993, at *7

15   (W.D. Wash. Dec. 23, 2025) (Lin, J.); *Arenado-Borges v. Bondi*, No. C25-2193, 2025 WL

16   3687518, at *5–6 (W.D. Wash. Dec. 19, 2025); *Baltodano v. Bondi*, No. C25-1958, 2025 WL

17   3484769, at *3 (W.D. Wash. Dec. 4, 2025); *Abubaka v. Bondi*, No. C25-1889, 2025 WL

18   3204369, at *2 (W.D. Wash. Nov. 17, 2025); *Nguyen v. Scott*, 796 F. Supp. 3d at 729–732.

19         As it did in *Elshourbagy*, this Court adopts the *Nguyen* court's detailed and thoughtful

20   analysis of this issue and the *Nguyen* court's findings that (1) "The class certification order in

21   *D.V.D.* does not prevent this Court from adjudicating Petitioner's claims regarding third-country

22   removal," and (2) absent "clear guidance from the Supreme Court," which the emergency docket

23   order in *D.V.D.* does not provide, this Court must follow well-established precedent. *Nguyen v.*

24   *Scott*, 796 F. Supp. 3d at 729–32.

### 2.     Injunctive Relief Regarding Removal Procedures Is Warranted

Petitioner presents the Court with an overview of the legal framework governing the countries to which a noncitizen may be removed, and under what circumstances. Dkt. No. 1 at 15–21. *Only* if it is "impracticable, inadvisable, or impossible" to remove a noncitizen to (a) the country the noncitizen has designated for removal; (b) the country of which the noncitizen is a subject, national, or citizen; (c) the country from which the individual was admitted to the United States, or which contains the port from which they disembarked for the United States or a contiguous territory; or (d) the non-citizen's country of birth (or the country that now contains their birthplace) or immediate previous residence may the government remove the noncitizen to "another country whose government will accept [them] into that country." *Id.* at 15–16 (citing 8 U.S.C. § 1231(b)(2)(E)). Even then, the government may not remove any person to a country where they will be persecuted or tortured. *Id.* at 16 (citing 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 208.16, 1208.16). Where third-country removal is anticipated due process requires *inter alia*, notice of the country to which the noncitizen will be removed that is not be provided "last minute," but with sufficient time that the noncitizen have a meaningful opportunity to apply for fear-based protection from removal. *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999). Courts in this District have found, and this Court agrees, that such notice must consist of "written notice of the country being designated" and "the statutory basis for the designation, i.e., the applicable subsection of § 1231(b)(2)," and that the noncitizen must be affirmatively asked whether they fear persecution or harm upon removal to the third country, with their response memorialized in writing. *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1019 (W.D. Wash. 2019).

If a noncitizen claims fear of removal to a designated third country, courts in this District have repeatedly held that ICE must give the petitioner an opportunity "to pursue [a] claim for withholding of deportation in reopened removal proceedings before an immigration judge."

1    *Abubaka*, 2025 WL 3204369, at *6; *see Arenado-Borges*, 2025 WL 3687518, at *6 (collecting

2    cases). These district court cases are not binding, but Respondents offer no reason the Court

3    should not follow them. The Court finds the reasoning in *Aden* and the other cases cited above

4    persuasive and concludes that constitutionally and statutorily compliant notice requires that,

5    before Petitioner may be removed to a third country, he must be given an opportunity to respond,

6    and—if he has a fear of persecution or torture—reopened removal proceedings before an

7    Immigration Judge.

8         Against this legal backdrop, the Court must evaluate each Party's position. Respondents

9    assert that "Petitioner's fear of removal to a third country is already protected under existing

10   DHS policy." Dkt. No. 6 at 16. And it is true that when Respondents presented Petitioner with a

11   Notice of Removal for Mexico on December 28, 2025, while Petitioner was given an opportunity

12   to express his "fear claim for Mexico" before an Immigration Judge, he was given the

13   opportunity to present it to United States Citizenship and Immigration Services ("USCIS"). Dkt.

14   No. 24 (Hammer Decl.) ¶¶ 3–7. On January 5, 2026, USCIS "made a Negative Screening

15   Determination" and served its decision on Petitioner the next day. *Id.* ¶¶ 8–9. On the other side

16   of the margin, however, is ICE's own current written policy, which Petitioner has attached to his

17   petition. *See* Dkt. No. 1-5 (July 9, 2025, Memorandum to ICE Employees). Alarmingly, this

18   policy provides that "[i]f the United States has received diplomatic assurances from the country

19   of removal that [noncitizens] removed from the United States will not be persecuted or tortured,

20   and if the Department of State believes those assurances to be credible, the [noncitizen] may be

21   removed *without the need for further procedures*." Dkt. No. 1-5 at 2 (emphasis added); *see also*

22   *Nguyen v. Scott*, 796 F. Supp. 3d at 736. In those cases where ICE has *not* received diplomatic

23   assurances it deems credible, an officer will serve the noncitizen with a notice of removal,

24   including the intended country of removal. Dkt. No. 1-5 at 2. However, the policy notes that ICE

1  "will not affirmatively ask whether the [noncitizen] is afraid of being removed to the country of

2  removal." *Id.* ICE will "generally wait at least 24 hours following service of the Notice of

3  Removal before effectuating removal," but in "exigent circumstances," ICE need wait only six

4  hours. *Id.* If the noncitizen "does not affirmatively state a fear of persecution or torture if

5  removed to the country on the notice within 24 hours," they will be removed to the third country.

6  *Id.*

7          These procedures fall far short of what courts in this District and Circuit have held that

8  due process requires. *See, e.g.*, *Francisco Lorenzo v. Bondi*, No. C25-2660, 2026 WL 237501, at

9  *9–10 (W.D. Wash. Jan. 29, 2026) (finding that Respondent's third-country removal policy, as

10 described in the July 9, 2025, memorandum, "simply do[es] not comport with due process");

11 *Escobar v. Chestnut*, No. C25-1801, 2025 WL 3687639, at *4 (E.D. Cal. Dec. 19, 2025)

12 ("Courts across this circuit have found that ICE's policy, as described in the March and July

13 Memoranda, is likely unconstitutional and contrary to Ninth Circuit precedent." (collecting

14 cases)). Respondents appear to argue that Petitioner is already provided with sufficient process

15 by the provisions of the ICE memo. *See* Dkt. No. 8 at 16–17. However, Respondents fail to

16 address the gaps between the process Petitioner seeks (and that courts have held is required) and

17 the process provided by the ICE policy. Moreover, Respondents misrepresent the protections

18 Petitioner will have under the ICE policy by, for instance, asserting that "If ICE were to seek

19 Petitioner's removal to a third country, ICE would provide him with a notice of its intent to

20 remove him and notice as to which country." *Id.* at 17 (citing Dkt. No. 1-5). In fact, depending

21 on any "diplomatic assurances" offered by the country for which removal is slated, Petitioner

22 may be given *no notice or process at all*. *See* Dkt. No. 1-5 at 2. As such, notwithstanding

23 Respondents' affording Petitioner the opportunity to express his fear of removal to Mexico on

24 one specific occasion, the unanswered facts presented by Petitioner—in the form of ICE's own

policy—along with Respondents' representations as to the process Respondents have afforded

Petitioner thus far and expect to afford him in the future (*see* Dkt. No. 6 at 16–17) do not inspire

confidence that Respondents can be relied upon to afford Petitioner with statutorily and

constitutionally sufficient process absent an order from this Court. Against the backdrop of the

written policy, the Court is unwilling to accept Petitioner's one-time experience as to removal to

Mexico as a dispositive indication of the process Petitioner will receive each time Respondents

contemplate his removal to a third country.

       A plaintiff or petitioner "seeking a permanent injunction must demonstrate (1) that he has

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388, 391 (2006). Petitioner meets this standard. He has shown that he suffered irreparable

injuries for which monetary damages are likely unavailable or inadequate to compensate him: his

unlawful detention and violation of his due process rights. *See Melendres v. Arpaio*, 695 F.3d

990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights

'unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373

(1976))). Petitioner is likely to suffer that injury again if Respondents attempt to remove him to a

third country without the protections required by the Due Process clause, and he is likely to

suffer even graver injury if a constitutionally deficient removal is effectuated. *See A.A.R.P. v.*

*Trump*, 605 U.S. 91, 94 (2025) (detainees with pending habeas petitions facing removal under

Alien Enemies Act faced "an imminent threat of severe, irreparable harm"). Were Petitioner to

be "removed from the United States to the custody of a foreign sovereign . . . the Government

[might] argue[], as it has previously argued, that no U.S. court ha[s] jurisdiction to order relief."

*Id.* at 93. That is, the legal remedies by which Petitioner might redress this harm would be substantially diminished, if not extinguished entirely. In light of such serious harm to Petitioner, the balance of equities tips steeply in his favor, because his interest in avoiding the unlawful deprivation of his liberty outweighs the minimal burden on Respondents to provide notice and an opportunity to be heard if they wish to remove him. Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (citation modified). Under these circumstances, injunctive relief is appropriate.

Because Petitioner has demonstrated that injunctive relief is warranted, the Court will grant Petitioner's request to "[o]rder that Respondents may not remove or seek to remove Petitioner to a third country without notice and meaningful opportunity to respond in compliance with the statute and due process in reopened removal proceedings."

### 3.    Fifth and Eighth Amendments

In addition to the procedural concerns discussed above, Petitioner further alleges that his potential third-country removal pursuant to current ICE policy would violate the Eighth Amendment's prohibition of cruel and unusual punishment, the Fifth Amendment's prohibition of extrajudicial punishment, and the long-established rule, dating to *Wong Wing v. United States*, 163 U.S. 228, 237–38 (1896), that no "infamous punishment" in addition to deportation may be imposed for immigration violations without a proper criminal trial. Dkt. No. 1 at 21.

In support of this argument, Plaintiff asserts that it has been reported that Respondents have "attempted—and completed—an 'end-run' around the protections of the Convention Against Torture by deporting a group of migrants to Ghana, which sent them on to their countries of citizenship despite fears of persecution." Dkt. No. 1 at 19 (citing Sarah Stillman, *Disappeared to a Foreign Prison*, The New Yorker (Dec. 12, 2025)). Petitioner alleges that the

Trump administration has hand-picked countries known for human rights abuses and instability for its deportations, in an attempt to spread fear and deter immigration, and that hundreds of noncitizens have been removed to third countries only to be met with mistreatment and summary, sometimes indefinite, detention. *Id.* While the Court notes that Petitioner does not substantiate these allegations, it notes also that Respondents do not deny them, and that "courts in this district and across the country have recognized that Petitioner is correct: the government is intentionally removing individuals to countries where they will be imprisoned." *Nguyen v. Bondi*, 2025 WL 3534168, at \*9 (citing *Nguyen v. Scott*, 796 F. Supp. 3d at 734 (collecting cases)).

In this particular case, faced with the particular pleadings before it, the Court does not have sufficient basis for a finding that Respondent's third-country removal program is unconstitutional as a whole, or that third-country removal would be punitive as applied to Petitioner specifically. Cases in this District in which courts *have* found as much, "which were specific to a particular population and particular destination countries, do not extend to these circumstances." *Arenado-Borges*, 2025 WL 3687518, at \*7 (citing *Nguyen*, 796 F. Supp. 3d at 734; *Abubaka*; 2025 WL 3204369, at \*8.)

On this record, the Court cannot find that Petitioner's removal to a third country would constitute unconstitutional punishment. The request is DENIED without prejudice.

## IV.    CONCLUSION

Accordingly, Petitioner's petition for writ of habeas corpus (Dkt. No. 1) is GRANTED. It is hereby ORDERED:

(1)    Respondents and all their officers, agents, employees, attorneys, and persons

acting on their behalf or in concert with them:

      (a)    SHALL release Petitioner from detention **no later than 5:00 p.m. on February 7, 2026,** under appropriate conditions of release;

      (b)    SHALL NOT remove or seek to remove Petitioner to a third country without affording him meaningful notice and an opportunity to be heard in conformity with 8 U.S.C. § 1231(b) and due process;

      (c)    SHALL submit to the Court, within twenty-four (24) hours of this Order, a declaration confirming that Petitioner has been released from custody and informing the Court of the date and time of his release.

(2)    Petitioner's request for injunctive relief regarding any future re-detention is DENIED. This denial is without prejudice to Petitioner's ability to challenge any future re-detention or to seek related injunctive relief, if appropriate.

(3)    Petitioner's request for an order prohibiting third-country removal as unconstitutionally punitive is DENIED without prejudice.

(4)    Petitioner's Emergency Motion for Order Preventing Transfer During Pendency of Petition (Dkt. No. 16) is DENIED AS MOOT.

Dated this 6th day of February, 2026.

Tana Lin
United States District Judge